UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DALE FREEMAN #752710,

    Plaintiff,                                                   Hon. Janet T. Neff

v.                                                            Case No. 1:19-cv-728

SCOTT L. HOLMES, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant David Kimmel's Motion for Summary Judgment (ECF No. 38) and the Motion for Summary Judgment of Defendant Scott Holmes, M.D., and Kyle Sperling, PA., (the Corizon Defendants) (ECF No. 40). The motions are fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that both motions be **GRANTED** and that Plaintiff's complaint be dismissed with prejudice.

**I.   Background**

Plaintiff, a prisoner incarcerated with the Michigan Department of Corrections (MDOC) at Carson City Correctional Facility (DRF), filed a complaint against several Defendants pursuant to 42 U.S.C. § 1983 alleging that they were deliberately indifferent to his serious medical need in violation of the Eighth Amendment. In particular, Plaintiff alleges that from May to July of 2018, Defendants failed to provide him deep toe box (DTB) shoes that would have prevented pressure ulcers from developing on his toe and failed to properly treat the wound. The remaining Defendants are Scott Holmes, M.D., Kyle Sperling, P.A., and Quartermaster David Kimmel.

1

Plaintiff is a paraplegic and is confined to a wheelchair. (ECF No. 1 at PageID.4; ECF No. 39-2 at PageID.347.) On November 3, 2015, Richard Worel, M.D., submitted a medical request for DTB shoes for Plaintiff due to bilateral hammertoes of 2nd toes with stage II and IV pressure ulcers on both toes. (ECF No. 40-1 at PageID.405.) The request was approved the same day. (*Id.* at PageID.406.) On November 11, 2015, Plaintiff received an accommodation notice for DTB shoes and was given a copy to take to the quartermaster. (ECF No. 39-2 at PageID.346.) In spite of his accommodation, Plaintiff claims that he was never issued a pair of DTB shoes. (ECF No. 51-1 at PageID.624.)

In May 2018, Plaintiff developed pressure ulcers on his toes, and he requested different shoes because he believed the shoes he had been issued were rubbing the tops of his toes and causing the injury. During this time Plaintiff was also being treated for pressure ulcers on his left hip. On May 4, R.N. Saunders was unable to assess Plaintiff's need for DTB shoes because Plaintiff needed to return to his housing unit to void. R.N. Saunders added the issue to his visit for a dressing change. (ECF No. 40-1 at PageID.407.) The following day, R.N. Plath spoke to Plaintiff about his shoes and noted that Plaintiff had "a couple of hammer toes" with white callouses and holes worn on the knuckles of those toes. Plaintiff said that his toes rubbed on the DTB shoes as well as the regular ones. (*Id.* at PageID.408.)

On May 15, Defendant Holmes saw Plaintiff for a scheduled provider visit. He noted that Plaintiff was asking for gym shoes because his DTB shoes were rubbing on the top of his toes. Defendant Holmes documented a hammer toe formation and provided Plaintiff band aids to cover the rubbed areas from the inside of the DTB shoes. Defendant Holmes ordered nursing to take pictures of Plaintiff's left foot showing the pressure ulcers and ordered a follow up to check the status of his pain. (*Id.* at PageID.410–11.)

On May 26, Plaintiff sent a kite to healthcare complaining of pain in his left toe from pressure ulcers and requesting different shoes to reduce pressure on his toes. RN Verschure scheduled an appointment with nursing and advised Plaintiff to notify healthcare if his toes had swelling, redness, were hot to the touch, or had colored drainage. (ECF No. 40-1 at PageID.419.) On May 27, R.N. Nagorny saw Plaintiff to change the dressing on his left hip. During the visit, Plaintiff mentioned a wound on his left second toe that was draining pus. Plaintiff again asked for different shoes. R.N. Nagorny observed a wound on Plaintiff's left second toe showing superficial injury to his skin with no signs of infection and no purulent drainage, erythema, swelling, or increase in skin temperature. R.N. Nagorny cleaned the toe, applied triple antibiotic ointment, and covered it with a band aid. She instructed Plaintiff to keep the area clean and dry and to contact healthcare if the toe got worse or signs of infection occurred. (*Id.* at PageID.420–22.)

On May 28, R.N. Steffke saw Plaintiff for complaints of achiness "all over" and a headache. Plaintiff thought his hip or his toe was infected. R.N. Steffke noted that the toe showed abraded skin with no surrounding redness or swelling. She reapplied the band aid. (*Id.* at PageID.423.)

On June 9, R.N. Verschure saw Plaintiff for a nursing visit for pain in the left second toe. Plaintiff described the pain as 10/10 and said that he began experiencing colored drainage, swelling, and fever the previous day. Plaintiff said that the area of the ulcer kept getting worse. Plaintiff's temperature was 101.2. The wound measured .5 cm by .5 cm and R.N. Verschure noted increased warmth, swelling, drainage, and pain. R.N. Verschure observed an area of redness from the toe to mid-top of the foot and outlined it with a purple marker. R.N. Verschure contacted Defendant Sperling, the on-call P.A., and discussed her findings with him. Defendant Sperling ordered Plaintiff added to the medical provider's Monday schedule and that nursing check the toe

all weekend. R.N. Verschure reviewed the signs and symptoms of infection with Plaintiff and told him to report any worsening signs or symptoms to healthcare. Plaintiff was instructed to take Tylenol for elevated temperature, apply a cool cloth to his forehead, elevate his foot, and increase his fluids. (*Id.* at PageID.424–26.) Later that day R.N. Saunders saw Plaintiff for a dressing change on his left hip. Plaintiff complained that he was not feeling well, had toe pain, and had a fever. Plaintiff's temperature was 99.3. Plaintiff was wearing two pair of socks on his left foot and had gauze dressing over his toes. R.N. Saunders noted a scant amount of dried dark red drainage on the dressing, no pronounced redness, and pulses were present. (*Id.* at PageID.427.)

R.M. Verschure saw Plaintiff on June 10 for a dressing change to his left hip and a recheck of his left toe. Plaintiff's temperature was 97.2, and he rated his pain at 5/10. R.N. Verschure noted swelling and redness in the toe and top of foot with increased skin temperature. There was no redness beyond the purple outline that R.N. Verschure had made the day before. R.N. Verschure cleansed the toe and applied a knuckle band aid. Later that day, R.N. Saunders noted a scant amount of dark red drainage on the dressing. Plaintiff said that he had produced a moderate amount of white and serous drainage by pushing on the top of his foot and "milking" the skin towards the opening. R.N. Saunders warned Plaintiff that doing this could cause additional tissue damage and delay healing. She cleansed the toe and applied new dressing. (ECF No. 40-1 at PageID.428–31.)

On June 11, P.A. Simon examined Plaintiff's toe. He noted that the skin was warm and dry and the toe had a shallow, ulcerative wound on the dorsal side without any active discharge. Some erythema had spread into some of the dorsal side of the foot. P.A. Simon discussed treatment options and Plaintiff agreed with starting Clindamycin. The treatment plan called for nursing to recheck the toe daily and apply topical antibiotic ointment to the ulcer and cover it with a sterile

non-stick dressing. P.A. Simon noted that Plaintiff was already coming to healthcare twice a day for his hip wound. (*Id.* at PageID.432–34.)

On June 12, Defendant Holmes saw Plaintiff for a scheduled visit. Plaintiff said that his DTB shoes did not work and that he had a pressure ulcer. Defendant Holmes ordered latex gloves and a recheck of the toe wound on the left foot. (*Id.* at PageID.436–37.)

On June 14, R.N. Mikel responded to Plaintiff's healthcare kite about his foot, noting that Plaintiff was seen twice a day and the swelling in his foot had decreased. (*Id.* at PageID.442.) The same day, Defendant Holmes saw Plaintiff for an unscheduled visit. Defendant Holmes noted that the ulcer on the second toe was "much worse" and appeared to be the point of entry for infection. Defendant Holmes ordered Ceftriaxone 1-gram solution injections to be administered for three days and a lab workup. Plaintiff received his first injection that evening. (*Id.* at PageID.442–48.)

On June 15, Defendant Sperling and R.N. Verschure saw Plaintiff for a dressing change. Defendant Sperling ordered nursing to stop Clindamycin and start Bactrim and to continue daily dressing changes. He instructed Plaintiff to continue with his injections. R.N. Bean ordered a culture of Plaintiff's left toe and noted that Plaintiff was wearing a sock, which appeared protective. R.N. Bean noted that Plaintiff currently had DTB shoes. (*Id.* at PageID.449–52.)

On June 15, Plaintiff submitted a kite requesting shoes to accommodate foot swelling and to prevent foot ulcers. R.N. Silvernail noted that Plaintiff had an upcoming appointment with the provider on June 19 to address his shoes and forwarded his complaint to "R.N. 13" for review. (ECF No. 40-1 at PageID.455.) On June 19, Defendant Holmes saw Plaintiff for a scheduled visit and noted that Plaintiff's toe appeared darker in hue, almost looking necrotic and gangrenous, with a very slow cap refill. Defendant Holmes ordered labs, a chart review to review the labs, and a follow-up visit. The following day, Defendant Holmes ordered an x-ray exam of Plaintiff's left

5

foot. (*Id.* at PageID.456–59.) On June 21, Defendant Holmes ordered labs, a chart review, and a provider visit for June 27. (*Id.* at PageID.460–61.)

On June 23, Lyle Mindlin, D.O., reviewed the x-rays of Plaintiff's foot and noted soft tissue swelling along the dorsum, no soft tissue air, and no evidence of osteomyelitis. (*Id.* at PageID.465.) On June 26, Defendant Holmes reviewed the x-rays and saw Plaintiff for a scheduled visit. Defendant Holmes checked Plaintiff's toe and noted that the color of his toe was a rather dark hue with not much change. The swelling was reduced. (*Id.* at PageID.466–68.)

On June 30, Plaintiff submitted two kites. His first kite, which requested different shoes to prevent further pressure ulcers, was forwarded to "R.N. 13." Plaintiff's second kite requested proper shoes. R.N. Stevens responded, explaining that Plaintiff had DTB shoes approved and that she would forward his request to the quartermaster to replace them and fit him with a new pair. R.N. Stevens said that "it sounds like you may need a deeper toe box, you can discuss sizes with [the quartermaster] when he contacts you." (*Id.* at PageID.469–70.)

On July 2, R.N. Nagorny saw Plaintiff for scheduled dressing changes to his left hip and left second toe. Plaintiff asked for new shoes, as the DTB shoes pressed on his toes and caused ulcers. Plaintiff left healthcare without addressing the shoe complaint because he wanted to return to his unit before count time. R.N. Nagorny scheduled a nursing appointment to address his shoe complaint. (*Id.* at PageID.471–73.)

On July 5, Defendant Sperling reviewed Plaintiff's chart and ordered a provider follow-up regarding Plaintiff's hip and toe and noted that the provider should consider a 407 (medical request authorization) if appropriate. (*Id.* at PageID.474–75.) The same day, R.N. Bean saw Plaintiff for a dressing change and advised Plaintiff that the quartermaster had been notified to order Plaintiff DTB shoes. (*Id.* at PageID.476.)

6

On July 9, Plaintiff saw Defendant Kimmel about a new pair of shoes. That day, R.N. Stevens sent Kimmel an email stating that Plaintiff currently had DTB shoes, but she was not sure of the size. She further indicated that the toe box area was not tall enough to prevent rubbing on the tops of Plaintiff's toes and asked Kimmel to replace his current shoes with something that provided more room. (ECF No. 39-3.) What occurred when Plaintiff saw Defendant Kimmel is subject to dispute. Plaintiff claims that he took off his left shoe and showed Kimmel the toe ulcer and informed him that the ulcer was from not having DTB shoes. Plaintiff states that, "[s]peaking in general if [Plaintiff] did state DTBS were not working, rubbing up against his toes etc. this was only a miscommunication." (ECF No. 46-2 at PageID.575.) Plaintiff states that when he showed Defendant Kimmel his toe ulcer, he informed Kimmel that he never received DTB shoes, but Kimmel responded that he did not give "a horse[']s ass" about Plaintiff's pressure ulcers. Plaintiff states that Defendant Kimmel would not order the new pair of DTB shoes until Plaintiff provided his current pair of DTB shoes for measurement, and then asked Plaintiff to leave. (*Id.* at PageID.576.) However, Plaintiff also states that he "is not claiming that Kimmel told him to turn in his old pair of shoes for new shoes." (*Id.* at PageID.575.) Defendant Kimmel, on the other hand, states that Plaintiff refused to be measured for DTB shoes because he said they did not work for him, but Kimmel had been advised that Plaintiff's only accommodation was for DTB shoes. Defendant Kimmel further states that, because Plaintiff refused to be fitted for DTB shoes, he was unable to assist Plaintiff in being fitted for any other type of shoe. (ECF No. 39-4 at PageID.372–73.) Defendant Kimmel states that he did not demand that Plaintiff turn in his old pair of DTB shoes and would not have done so unless he had a new pair of shoes to give him. (*Id.* at PageID.373.)

7

On July 11, R.N. Silvernail saw Plaintiff about his toe ulcer. Plaintiff stated that it had been rubbing on his shoe, which did not fit correctly, and that he had not been wearing a sock so that he had more room in the shoe. R.N. Silvernail changed the dressing and noted that she would monitor the toe daily. Defendant Sperling ordered Plaintiff to wear a medical sandal on his left foot and to not wear a shoe. He further advised Plaintiff not to wear shoes without socks. (ECF No. 40-1 at PageID.479–80.)

On July 12, Plaintiff presented to healthcare stating that he was not feeling well. He reported that his toe was extremely painful, and the swelling was worse. R.N. Wheeler removed the dressing and noted a small amount of drainage and a large amount of swelling. The entire toe was blackened below the nail bed and further down the toe. Plaintiff reported that his pain was 8/10, and his temperature was 101.4. R.N. Wheeler contacted Defendant Sperling with her findings, and Sperling ordered that Plaintiff be sent to the emergency room by state car. (*Id.* at PageID.481.) Plaintiff was taken to the emergency department at Sparrow Hospital, where he presented with a chief complaint of cellulitis of the left foot, second toe. He was treated with normal saline and Motrin for fever and transferred to Duane Waters Hospital (DWH). (*Id.* at PageID.483–489.)

Plaintiff was treated at DWH from July 12 to July 19 for cellulitis to his left second toe. Plaintiff stated that the wound was caused by his shoes and that despite having DTB shoes, his toes curl up due to a spinal cord injury, and he developed wounds. (*Id.* at PageID.490.) On July 14, P.A. Alford submitted an ACMO review for an orthotics consultation for orthotic shoes. She noted that Plaintiff had tried DTB shoes, but they were insufficient. (*Id.* at PageID.494.) On July 16, Rickey Coleman, D.O., deferred the request and instead approved MSI tennis shoes. (*Id.* at PageID.495.) On July 18, P.A. Alford noted that the cellulitis in Plaintiff's toe had significantly

8

improved. She also noted that Plaintiff previously had standard athletic shoes but extra DTB shoes may be available to order from MSI and that they could likely be supplied at DRF when Plaintiff returned. (*Id.* at PageiD.497.) P.A. Alford spoke to Defendant Sperling about Plaintiff's footwear needs and told him that MSI was able to create extra DTB shoes. Defendant Sperling indicated that Plaintiff had been wearing a postop shoe to prevent rubbing on his toes but that the medical staff at DRF would follow up on this issue with Plaintiff. (*Id.* at PageID.499.)

On July 23, Defendant Holmes ordered MSI tennis shoes as approved by Dr. Coleman. The next day, R.N. Stevens notified Defendant Kimmel to issue Plaintiff a pair of athletic shoes. (*Id.* at PageID.502–06.) By August 27, Plaintiff's toes were healed. (*Id.* at PageID.521.)

On September 23, Plaintiff submitted a kite to healthcare asking about the status of the tennis shoes. R.N. Stevens responded that she originally asked Defendant Kimmel to issue the shoes on July 24 and asked him about the status in September. Defendant Kimmel indicated that the order was still in process. (*Id.* at PageID.522.) Plaintiff received the MSI tennis shoes about 45 days after the initial request was submitted. (ECF No. 40-4 at PageID.536.)

## II.     Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The unnecessary and wanton infliction of pain encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a prisoner receives no treatment for a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must

"place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier*, 238 F.3d at 742 (internal quotation marks omitted).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837 (1994). *Id.* at 837. In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).

"A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Rhinehart*, 894 F.3d at 738 (citing *Farmer*, 511 U.S. at 844). So long as a doctor does not knowingly expose a prisoner to an excessive risk of serious harm and exercises reasonable medical judgment, the Sixth Circuit will defer to the doctor's judgment. *Id.* "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Moreover, where the plaintiff's claim amounts to disagreement with the medical provider's judgment or approach to medical treatment, the claim against the defendant-provider fails. *See White v. Corr. Med. Servs.*, 94 F. App'x 262, 264 (6th Cir. 2004).

### A. The Corizon Defendants

Plaintiff contends that Defendant Sperling was deliberately indifferent to Plaintiff's serious medical need by failing to give him antibiotics and/or send him to the hospital the weekend of June 9 and by failing to follow up on Plaintiff's request for DTB shoes to prevent pressure ulcers. Regarding Defendant Holmes, Plaintiff's primary, if not sole contention, is that Defendant Holmes failed to provide him DTB shoes or follow through on Plaintiff's stated need for DTB shoes by submitting a request for them.

First, regarding medical care for the toe ulcer, Plaintiff's medical records demonstrate that he received ongoing care for his condition. Under such circumstances, to establish the objective component, a plaintiff must show that his care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The medical record establishes that Plaintiff was seen numerous times by Defendants and other healthcare providers regarding his complaints of pain due to his toe ulcer. On many occasions, the provider cleaned the wound, applied ointment, and dressed it.

Defendant Sperling was involved with Plaintiff's care on several occasions. On June 9, when Plaintiff complained of pain in his toe, based on the nurse's findings, Defendant Sperling ordered Plaintiff to be added to the next provider visit that Monday and had nursing check his toes throughout the weekend. Plaintiff was instructed to take Tylenol for his elevated temperature, apply a cool cloth to his forehead, elevate his foot, and increase fluids. Plaintiff was seen later that day with a decreased temperature of 99.3. Plaintiff was seen twice the following day for his toe. That Monday, June 11, Plaintiff was seen by P.A. Simon, who started Plaintiff on Clindamycin. Subsequently, on June 15, Defendant Sperling ordered Plaintiff to stop his Clindamycin and to start Bactrim, instructed Plaintiff to continue with his Rocephin injections, and ordered daily

dressing changes for two weeks. On July 11, 2018, when Plaintiff complained that his shoe did not fit correctly, Defendant Sperling ordered a medical sandal for Plaintiff's left foot. Finally, on July 12, when Plaintiff complained that he did not feel well and had presented with an elevated temperature and painful swelling, Defendant Sperling ordered Plaintiff to be sent to the emergency room. Given this evidence, Plaintiff fails to demonstrate that the care Defendant Sperling provided was so grossly incompetent or inadequate as to shock the conscience. Although Plaintiff argues that Defendant Sperling should have sent him to the hospital or ordered antibiotics the weekend of June 9 and 10, his argument is nothing more than a difference of opinion regarding his medical treatment, which is insufficient to establish an Eighth Amendment violation. *Estelle*, 429 U.S. at 107; *see also Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017) (noting that "a desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim").

Although Plaintiff does not specifically complain about Defendant Holmes's treatment of the toe ulcer, the medical records refute any claim that it was constitutionally deficient. The records show that Defendant Holmes ordered Rocephin injections, submitted a Pain Management Committee consultation request, and ordered laboratory workups, x-rays, and medications. Given this evidence, Plaintiff fails to establish the objective component of his claim as for the treatment of his toe ulcer. Moreover, Plaintiff fails to present evidence to establish that either Defendant Sperling or Defendant Holmes was deliberately indifferent to a serious risk or harm that the toe ulcer presented. As set forth above, both Defendants treated Plaintiff's condition. The fact that Plaintiff was eventually admitted to DWH does not establish an Eighth Amendment claim.

Plaintiff's central argument is that Defendants failed to provide him DTB shoes, which would have provided more room for Plaintiff's toes, allowing the wound to heal. Plaintiff claims

13

that although he had an accommodation for DTB shoes, they were never issued to him. Citing *Scott v. Harris*, 550 U.S. 372 (2007), Defendants argue that they are entitled to summary judgment solely on the basis of the medical record, which, they claim, constitutes objective evidence of the same character as the video evidence that was presented in *Scott*. Defendants note that the medical record contains several entries indicating that Plaintiff stated to medical personnel on several occasions that his DTB shoes rubbed on the top of his toes, did not work, and pressed on his toes, causing ulcers.

Defendants' reliance on *Scott* is misplaced. *Scott*'s holding is limited to a narrow class of cases in which truly objective evidence—for example, a videotape that clearly shows the events in question—soundly refutes the opposing party's version of events. *Id.* at 380. Plaintiff's medical records—recorded by his medical personnel at or shortly after the time of service—are not irrefutable evidence in the same way as a videotape because they could be subject to dispute. *Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479 (6th Cir. 2014), which Defendants cite, is distinguishable from the instant case because the evidence presented in *Booher* was the uncontested medical opinion of a doctor based upon his review of the medical records relating to the plaintiff's injury. *Id.* at 482. Here, Defendants rely not on an uncontested medical opinion, but upon records purporting to record Plaintiff's statements.

In any event, even though *Scott* is inapplicable here, in my judgment, Plaintiff's claim based on failure to provide DTB shoes fails because Plaintiff cannot establish the subjective prong of his claim. That is, even crediting Plaintiff's assertion that he was never issued DTB shoes, the evidence he cites does not establish that either Defendant was subjectively aware of this fact and nonetheless ignored an excessive risk of serious harm to Plaintiff. As noted, the medical record is replete with references to Plaintiff's DTB shoes. In fact, in a kite submitted to healthcare on May

14

25, Plaintiff himself stated, "The deep toe shoes dont [sic] work, or regular shoes. I need some shoes to reduce the pressure on my left toes." (ECF No. 1-1 at PageID.18.) The records show that all other medical personnel were under the impression that Plaintiff had DTB shoes, perhaps because Plaintiff had misinformed them, as he did in his May 25 kite. For example, on May 5, R.N. Plath noted that Plaintiff said that his toes rubbed on the DTB shoes, as well as the regular ones. (ECF No. 40-1 at PageID.408.) On June 15, R.N. Bean noted that Plaintiff had "DTB shoes currently." (*Id.* at PageID.452.) On July 2, R.N. Nagorny noted that Plaintiff said that the "deep toe box shoes do not work for [Plaintiff]." (*Id.* at PageID.471.) On July 2, R.N. Stevens emailed Defendant Kimmel to let him know that Plaintiff "currently ha[d] deep toe box shoe[s]." (ECF No. 39-3 at PageID.369.) And, on July 14, P.A. Alford, at DWH, noted that "despite having deep toe box shoes, [Plaintiff's] toes curl up due to spinal cord injury and he has developed wounds." (ECF No. 40-1 at PageID.490.) In the end, it was not DTB shoes that were identified as the solution to Plaintiff's problems, but "*extra deep* toe box shoes." (*Id.* at PageID.499.) While it may be the case that Defendants should have done more to discover that Plaintiff did not, in fact, have a pair of DTB shoes or that extra deep toe box shoes were available, and that Defendants may well have been negligent in this regard, negligence will not suffice to support an Eighth Amendment claim. *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) (citing *Estelle*, 429 U.S. at 105–06.)

Accordingly, I recommend that the Court grant summary judgment on Plaintiff's claims against Defendants Sperling and Holmes.

    **B.**    **Defendant Kimmel**

Plaintiff's claim against Defendant Kimmel is governed by the same standards set forth above. Defendant Kimmel did not see Plaintiff until July 9—three days before Plaintiff was sent to the emergency room and then admitted to DWH. As set forth above, Plaintiff and Defendant Kimmel disagree on what happened during the exchange. For purposes of Defendant Kimmel's

motion, Plaintiff's version must be accepted as true. Plaintiff claims that when he told Kimmel that he never received DTB shoes, Kimmel responded that he did not give "a horse[']s ass" about Plaintiff's pressure ulcers and would not order a new pair of DTB shoes until Plaintiff turned his old pair in. (ECF No. 46-2 at PageID.576.)

Assuming that Plaintiff can establish the objective prong of his claim, he fails to establish that Defendant Kimmel was aware of and ignored an excessive risk of harm to Plaintiff's health. Plaintiff claims that he never had DTB shoes and that Defendant Kimmel was deliberately indifferent to Plaintiff's medical need for DTB shoes when he refused to provide them. But R.N. Stevens had informed Defendant Kimmel that Plaintiff already had DTB shoes and that he needed something with more room in the toe to replace them. (ECF No. 39-3.) Plaintiff even concedes that he may have "miscommunicated" to Kimmel that his DTB shoes were not working because his toes rubbed against them. (ECF No. 46-2 at PageID.575.) Defendant Kimmel thus did not act with deliberate indifference in requiring Plaintiff to turn in his old DTB shoes for measurement before he ordered new DTB shoes. (*Id.* at PageID.576.) Because R.N. Stevens had asked Defendant Kimmel to provide DTB shoes with more room for Plaintiff's toes because his current pair of DTB shoes were not working, it would have made little sense for Defendant Kimmel to order a new pair of shoes without measuring the old pair to see how much room they provided. Again, it may be that Defendant Kimmel—apparently like every healthcare worker at DRF who dealt with Plaintiff—was mistaken that Plaintiff already had a pair of DTB shoes, but this would not support an Eighth Amendment deliberate indifference claim.

Plaintiff's claim against Defendant Kimmel also fails for another reason. In a Section 1983 claim, as in all civil cases, a plaintiff must show that the defendant's conduct proximately caused his injury. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985). The law is well established

that "proximate causation is an essential element of a § 1983 claim for damages." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 659 (6th Cir.1994) (citing *Doe v. Sullivan Cnty.*, 956 F.2d 545, 550 (6th Cir. 1992)). "Section 1983 does not permit individuals to sue state actors in the abstract; it requires them to connect alleged constitutional violations of the individuals' rights to state conduct." *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 614 (6th Cir. 2018) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Here, Plaintiff cannot show that Defendant Kimmel's alleged violation caused his injury. By the time Defendant Kimmel saw Plaintiff, Plaintiff had already had the toe ulcer for almost two months. Defendant Kimmel's alleged refusal to provide Plaintiff DTB shoes therefore did not cause the toe ulcer. Moreover, Plaintiff cannot argue that Defendant Kimmel's refusal to provide Plaintiff DTB shoes prevented his toe ulcer from healing, as the evidence shows that the toe ulcer had healed by August 27, 2018, without DTB shoes.[1]

Therefore, I recommend that the Court also grant Defendant Kimmel's motion for summary judgment.[2]

Finally, Plaintiff has filed a motion requesting that the Court enter an order transferring Plaintiff to a new facility or directing that Plaintiff be housed in a handicap accessible cell. (ECF No. 54.) The relief Plaintiff requests is unrelated to the issues and Defendants involved in this case, and in any event, the Court lacks jurisdiction over the individuals as to whom such order would be

---

[1] The evidence also shows that, even if Defendant Kimmel had ordered DTB shoes for Plaintiff, it would not have prevented Plaintiff's trip to the emergency room and admission to DWH three days later. Plaintiff testified that he finally received his MSI tennis shoes 45 days after the request was submitted. (ECF No. 40-4 at PageID.536.) Nothing in the record indicates that Plaintiff would have received his DTB shoes any sooner had Defendant Kimmel ordered them on July 9.

[2] Defendant Kimmel also requests that the official capacity claim be dismissed and that the Court determine that he is entitled to qualified immunity. The official capacity claim was previously dismissed. (ECF No. 27 at PageID.303.) Because Plaintiff fails to establish that Defendant Kimmel violated his Eighth Amendment rights, the Court need not address qualified immunity.

directed—the prison officials who make cell or facility assignment decisions—because they are not Defendants in this case. Moreover, in light of the recommendation set forth above that Defendants are entitled to summary judgment, I recommend that Plaintiff's motion for a preliminary injunction be denied as moot. *See Smith v. Alford*, No. 1:13-cv-694, 2015 WL 6159397, at *5 (W.D. Mich. Oct. 20, 2015) (granting the defendant's motion for summary judgment and dismissing as moot the plaintiff's motion for preliminary injunction); *Moses v. Rapelje*, No. 08-12161, 2009 WL 1133345, at *1, 11 (E.D. Mich. Apr. 22, 2009) (granting summary judgment and denying the plaintiff's motion for preliminary injunction as moot).

## IV.  Conclusion

For the foregoing reasons, I recommend that Defendant Kimmel's Motion for Summary Judgment (ECF No. 38) and the Corizon Defendants' Motion for Summary Judgment (ECF No. 40) be **GRANTED** and that Plaintiff's complaint be **dismissed with prejudice**.

Dated: May 19, 2021
/s/ Sally J. Berens
SALLY J. BERENS
U.S. Magistrate Judge

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).